## UTAH POWER & LIGHT CO. v. PUBLIC SERVICE COMMISSION et al.

No. 6658. Decided October 10, 1944. (152 P. 2d 542.)

158

See 16 C. J. S. Constitutional Law, Sec. 699; [7] 50 Am. Jur. 309.

*George R. Corey, Judd, Ray, Quinney & Nebeker,* and *W. G. Howell,* all of Salt Lake City (*S. I. Barber* and *Reid & Priest,* all of New York City, of counsel), for plaintiff.

*Grover A. Giles,* Atty. Gen., and *Clinton D. Vernon,* of Salt Lake City, for defendants.

WOLFE, Chief Justice.

Certiorari to review an order of the Public Service Commission of Utah. The order directed a reduction in the rates charged by the Utah Power & Light Company to its customers in Utah for electrical energy.

The petitioner, hereinafter called Company, is a corporation duly organized and existing under and by virtue of the

laws of the State of Maine and duly authorized to do business in the State of Utah. It is an "electrical corporation" and a "public utility" as those terms are defined in Title 76, U. C. A. 1943. It furnishes electrical energy to customers in southeastern Idaho, northern and central Utah, and a small part of southwestern Wyoming. For the purposes of this case the Commission accepted the Company's separation or allocation of plant which it considered was used and useful in the rendering of electrical service in the state of Utah. On the basis of this separation 90.6% of the total plant cost was allocated to Utah operations.

On August 15, 1942, the Public Service Commission of Utah, hereinafter referred to as the Commission, upon its own motion initiated this proceeding to inquire into the reasonableness of rates charged for electrical energy by the Utah Power & Light Company. An amended complaint was filed by the Commission on September 15, 1942. This complaint alleged in substance that the Company was at present and had been earning in excess of a reasonable return on a "just and proper rate base." It further alleged that the rates charged by the Company were unjust, unreasonable, and otherwise in violation of Title 76 of 1933 Revised Statutes of Utah, as amended. The complaint ordered that a public hearing and investigation be had to determine a just and proper rate base; to ascertain a fair and reasonable rate of return on said rate base, and to inquire into the reasonableness of the Company's existing rates.

The Company by answer denied that it had been making more than a reasonable rate of return or that its rates were unjust, unreasonable or unlawful. It further alleged that it was entitled to earn a reasonable return upon the *value* of its property used and useful in rendering electrical services to customers in Utah.

After a lengthy hearing the Commission found against the Company on all material issues and ordered that "the rates and charges made and demanded and received by the Utah Power & Light Company from its customers in the state of Utah for electric energy shall be decreased to reflect a reduc-

tion in rates which, when applied to the 1941 volume of sales, will amount to not less than $1,504,644 annually." It further ordered the Company to file with the Commission new schedules of rates that would "(a) reflect the rate reduction ordered * * * and (b) be non-discriminatory, just and reasonable * * *." The company thereupon filed an application for rehearing setting forth in detail the grounds therefor. This application was denied and the Commission brought the record before this court for review.

While numerous grounds are urged as a basis for reversal of the Commission's order, there is one fundamental contention, upon the determination of which many of the other specifications of error hinge. In its original brief the Company posed this issue by its contention that it had a right, granted by statute and insured by the Constitution, to have its rates established by the Commission at a level which would permit the Company to earn a reasonable return on the *"fair value"* of its property used and useful in serving its Utah customers.

The Company does not contend that the Commission was required to adopt any single formula or any particular group of formulae as a measuring rod for ascertaining value. Its contention is simply that the Commission is required to adopt some formula reasonably calculated to find the *"present fair value"* of the property; that the Commission cannot ignore evidence of value and determine a rate base founded upon the *"cost"* of the property devoted to public service. This argument recognizes the essential difference between what might have been paid for property many years ago and what the property is now worth. When various properties were acquired they may have been of the best known most modern design and of great value, and a short time thereafter may have been rendered practically worthless because outmoded by later technical advances in the art of producing electrical energy. Conversely, the property may have been acquired when land values were low and few markets were available at a relatively low cost and now because of the growth of the area—

increase in available demand for the product and increased demand for land—be of greater value. In its original brief, the Company contended that it had both a *constitutional* and a *statutory* right to have its rate base established in relation to *value* as distinguished from *cost;* that it was entitled to a rate which would permit it to earn a reasonable return on the present fair value of its property. ·

Between the time the Company filed its original brief and the time it filed its reply brief, the United States Supreme Court decided the case of *Federal Power Commission* v. *Hope Natural Gas Company*, 1944, 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. —. In view of this decision the Company abandoned its contention that the right to have rates established on a "value" rate base was insured by the Federal Constitution. However, it vigorously contends that the Commission is still required by the various sections of the Public Utilities Act, Title 76, U. C. A. 1943, to fix utility rates upon a value rate base.

The Commission adopted a directly contrary position. It held that the just and proper rate base for the Company is the amount actually and "prudently invested" in the property used and useful in rendering Utah service. The Company offered to prove the value of its property by evidence of the reproduction cost new and reproduction cost new less depreciation as of July 1, 1941. Considerable evidence along this line was admitted. In its report the Commission stated that:

"After listening to such testimony for about a day and a half the Commission asked the Company to state what additional witnesses it proposed to call in connection with the reproduction cost new less depreciation of its properties in Utah and, briefly, what their testimony would be. Counsel for the Company prepared a statement as to what additional testimony it proposed to offer in this connection and read the same into the record. After considering the testimony which had been received and the statement of what additional evidence on reproduction cost the Company proposed to offer, the Commission sustained an objection to the introduction of further evidence on this subject and granted a motion to strike the evidence in that regard which had been read into the record.

The objections made by counsel for the Commission to such evidence were that it is unreliable, fallacious, immaterial, irrelevant, incompetent, and of no probative value in such a case as this."

Toward the close of the hearing the question of the admissibility of this evidence relating to reproduction costs, etc., was again raised. The Commission ruled that "however offered or submitted, the Commission would not receive in evidence proof of reproduction cost new and proof of reproduction cost new less depreciation." In so ruling, the Commission indicated that it was cognizant of the role of reproduction cost data in ascertaining the present fair value of utility property for it stated that "Under the 'fair value' rule reproduction cost new less depreciation is frequently the controlling element."

From the entire record it becomes unmistakably clear that the Commission rejected "fair value" as a measuring rod for the determination of a proper rate base. In lieu of "fair value" the Commission purported to ascertain the dollars "prudently invested" in the acquisition of Company's property and the expense of integrating that property into a co-ordinated system. This prudent investment cost was adopted as the rate base upon which the Company was to be permitted to earn a reasonable return. We, therefore, are squarely confronted with the question of whether a utility in the state of Utah has the right to have rates established by the regulatory body which will permit the utility to earn a reasonable return on the "fair value" of its property which it has devoted to rendering public service in Utah. If it has, this court must set aside the order of the Commission which established a rate base which excludes value and purports only to reflect the amount "prudently invested" in acquiring the property and integrating it into single system.

The problems implicit in resolving this contention dictate that we discuss the development of substantive constitutional law regarding rate legislation before determining whether or not Utah statutes require the Commission to use a value rate base in establishing rates.

A logical starting point for an analysis of the development of constitutional limitations on the power of legislatures to regulate the rates charged for the use of privately owned property is the case of *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77. This case involved an attempt by the state of Illinois to regulate the prices charged for elevator services in the handling of grain. The owners of the elevators protested that the fixing of rates was an unconstitutional interference with private ownership. The Supreme Court sustained the legislation and for the first time recognized the existence of a "utility" which is affected with a public interest and therefore subject to control.

The court there pointed out that prior to the adoption of the Fourteenth Amendment "it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. * * *" Page 125 of 94 U. S., 24 L. Ed. 77. It was further stated that "property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large." And when devoted to public use, the owner in effect grants the public an interest and must subject himself to regulation. The court then stated:

"It is insisted, however, that the owner of property is entitled to a reasonable compensation for its use, even though it be clothed with a public interest, and that what is reasonable is a judicial and not a legislative question.

"As has already been shown, the practice has been otherwise. In countries where the common law prevails, it has been customary from time immemorial for the legislature to declare what shall be a reasonable compensation under such circumstances, or, perhaps more properly speaking, to fix a maximum beyond which any charge made would be unreasonable. * * *

"We know that this is a power which may be abused; but that is no argument against its existence. For protection against abuses from legislatures the people must resort to the polls, not to the courts."

This declaration regarding the power of the legislatures to fix rates of businesses affected with a public interest

was clear and all inclusive. The doctrine that the people must resort to the polls, not to the courts, for redress against abuses of legislative power was re-affirmed on the same day in a group of cases known as the Granger cases, *Chicago, Burlington & Quincy Railroad Co.* v. *Iowa*, 94 U. S. 155, 24 L. Ed. 94.

Mr. Justice Field, at this early date, was well aware of the fact that the legislature could not possibly deny to any owner of property the power to make as much money from his property as he had anticipated without destroying some portion of the value of that property. Since he thought that the *value* of private property must be protected at all costs, he dissented. "If it be admitted," he said, "that the legislature has any control over the compensation, * * *. the amount fixed will operate as a partial destruction of the value of the property, if it fall below the amount which the owner would obtain by contract * * *." He for this reason denied that the legislature had any right whatever to regulate the prices charged by the grain elevator owners.

The statement adhered to by the majority of the court to the effect that the courts would not interfere even though the legislature abused its power was not destined to stand. Seven years later in *Spring Valley Water-Works* v. *Schottler*, 110 U. S. 347, 354, 4 S. Ct. 48, 51, 28 L. Ed. 173, the court, although affirming the right of the legislature to regulate rates, sounded a warning that this power of regulation may not be without legal limits. It stated that the rate regulations involved did not deprive one of his property without due proces of law. "What may be done," it warned, "if the municipal authorities do not exercise an honest judgment, or if they fix upon a price which is manifestly unreasonable, need not now be considered, for that proposition is not presented by this record." Close on the heels of this decision the court said in *Stone* v. *Farmers' Loan & Trust Company*, 116 U. S. 307, 331, 6 S. Ct. 334, 345, 388, 1191, 29 L. Ed. 636, that "it is not

to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation."

In *Dow* v. *Beidelman,* 1887, 125 U. S. 680, 690, 8 S. Ct. 1028, 31 L. Ed. 841, the court reverted somewhat to its original enunciation of the *Munn* v. *Illinois* case and expressed doubts that it could in any case nullify rates established by state legislatures. Up to this time all the discussion of the power of judicial review over state legislative rate making power had been dicta. The court apparently was leaning toward judicial restraints but was hesitant to lay down rules and standards by which such judicial restraint could be applied. Finally in 1890 in the case of *Chicago, Milwaukee & St. Paul Ry.* v. *Minnesota,* 134 U. S. 418, 10 S. Ct. 462, 702, 33 L. Ed. 970, the court held a statute unconstitutional because it purported to give to a commission the final power to set rates for railroads and denied the railroads redress to the courts on the issue of the reasonableness of rates. The decision did not purport to set forth any touchstones by which courts were to determine whether or not rates were reasonable. It covered merely the question of the right of judicial review and held unconstitutional a statute which had been construed by the state court as giving final say on the question of reasonableness to the Commission.

In 1894 in the case of *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014, the court took the final step and actually held that rates established by the Railroad Commission of Texas were unjust and unreasonable. Re-emphasizing this doctrine the court in *St. Louis & San Francisco Railroad Co.* v. *Gill,* 156 U. S. 649, 657, 667, 15 S. Ct. 484, 487, 491, 39 L. Ed. 567, 573, stated that "there is a remedy in the courts for relief against legislation establishing a tariff of rates which is so unreasonable as to practically destroy the value of property of companies engaged in the carrying business." The theory

upon which the court proceeded was that legislation which set rates at an unreasonable low level was in conflict with the constitution in that it deprived companies of their property without due proces of law. None of the cases had to this point set forth any standard by which courts could test the reasonableness of rates. It was, however, now settled law that the question of reasonableness was a judicial question left finally in the hands of the courts. The doctrine regarding court review laid down so emphatically in the Munn and Granger cases was completely overruled.

During this early formative period rates were usually established by direct legislative enactment. It was untenable to hold that a legislative enactment per se lacked the elements of due process. Courts groped for a constitutional means by which the power to regulate could be checked. Since the *process* for setting rates—an act of the legislature—could not be deemed violative of due process, the courts looked to the result of the rate itself. If it was unreasonably low so that the court on the evidence could determine that it would not yield an adequate return, it was held unconstitutional by drawing an analogy with the familiar eminent domain cases. See Brewer's opinion in *Ames* v. *Union Pac. Ry.*, C. C. 1894, 64 F. 165.

It was upon the stage thus set that the court in the now famous case of *Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, developed the "fair value" rule as the test of reasonableness of rates. Here in 1898 the court specifically announced the rule that the owner of private property devoted to a public use is entitled to a "fair return" on the "fair value" of his property devoted to public use. The opinion of Judge Brewer in the same case before the circuit court (*Ames* v. *Union Pac. Ry. Co.,* 64 F. 165) and the opinion of Judge Ross in *San Diego Land & Town Company* v. *National City,* C. C., 74 F. 79, first sounded the keynote for the "fair value" doctrine adopted by the

Supreme Court in *Smyth* v. *Ames*. The crux of the Supreme Court's pronouncement, though dicta, is contained in the much cited quotation found in the margin.[1]

At the time of *Smyth* v. *Ames*, because of existing price levels, the figure reached by applying the reproduction cost less depreciation formula would be considerably less than the actual amount of historical cost. Hence during this period the utilities were desirous of having rates based on historical cost. But in *San Diego Land & Town Co.* v. *National City*, 1899, 174 U. S. 739, 757, 19 S. Ct. 804, 43 L. Ed. 1154, the court rejected cost as a rate base. A second San Diego Land and Town case, *San Diego Land & Town Co.* v. *Jasper*, 1903, 189 U. S. 439, 442, 23 S. Ct. 571, 47 L. Ed. 892, was even more emphatic in disposing of a claimed right to a fair return upon the *cost* of the property. It should also be noted that the last two cited cases placed considerable emphasis on the fair value *at the time of inquiry.*

Next followed a decision in which the Court considered the rate of return (see *Willcox* v. *Consolidated Gas Company*, 212 U. S. 19, 48, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A., N. S., 1134, 15 Ann. Cas. 1034) and pointed out that

---

[1] "We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." 169 U. S. 466, 546, 547, 18 S. Ct. 118, 434, 42, L. E. 819.

there "is no particular rate of compensation which must in all cases and in all parts of the country be regarded as sufficient for capital invested in business enterprises." The court then listed certain elements which it thought pertinent in ascertaining a reasonable rate of return. On the same day, January 4, 1909, the court in *City of Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371, discussed at length the rule of depreciation in arriving at a fair value rate base.

The next major development occurred in 1913 with the decision in the Minnesota Rate Cases, *Simpson* v. *Shepard,* 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A., N. S. 1151, Ann. Cas. 1916A, 18. The court reaffirmed the doctrine of *Smyth* v. *Ames* regarding the right of a company to earn a fair return upon the reasonable value of the property at the time it is being used for the public. The importance of the case lies in the rejection by the court of the attempt to apply the cost-of-reproduction method to valuation of land. This case demonstrates that the court would not sanction the application of the cost-of-reproduction method of valuation where the results obtained thereby would be unreasonable; that methods of valuation must adhere to the facts and not depend unduly on conjecture; that the company is entitled to the unearned increment arising from the increase in the value of its lands; and last that the maximum sum at which the company would be permitted to value its land holdings for rate making purposes is the value of other lands located in that vicinity of similar character. See Barnes, Econ. of Public Utility Regulation, p. 282.

Immediately following the end of the first World War, courts and commissions were urged to make allowances for the inflationary price levels then existing. The effect of abnormal prices and the recognition of a new price "plateau" upon the determination of present fair value was discussed at length by the court in *Galveston Elec. Co.* v. *Galveston,* 1922, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678, and in *Southwestern Bell Telephone Co.* v. *Public Service Comm.,*

1923, 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807. These were enlarged upon by the court in 1927 in the case of *McCardle* v. *Indianapolis Water Company,* 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316 (Brandeis and Stone dissenting). In the majority opinion it was stated:

"But in determining present value, consideration must be given to prices and wages prevailing at the time of the investigation; and, in the light of all the circumstances, there must be an honest and intelligent forecast as to the probable price and wage levels during a reasonable period in the immediate future. In every confiscation case, the future as well as the present must be regarded. * * *" page 408 of 272 U. S., page 147 of 47 S. Ct., 71 L. Ed. 316.

From 1923 until 1929 there were three other cases in addition to those last cited which are considered to be leading cases; namely, *Georgia Railway & Power Company* v. *Railroad Commission,* 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; *Bluefield Waterworks & Improvement Company* v. *Public Service Commission of West Virginia,* 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; and *St. Louis & O'Fallon Railway Co.* v. *United States,* 279 U. S. 461, 49 S. Ct. 384, 73 L. Ed. 798. Each of these case involved the question of the reasonableness of rates fixed by regulatory commission and in each case the court reaffirmed the basic fair value doctrine of *Smyth* v. *Ames.* In each the court stated that the standard for testing the reasonableness of rates was the fair value at the time of the inquiry of the property devoted to public service.

It was in the Southwestern Bell Telephone Company case that Justice Brandeis rendered his now famous concurring opinion in which he concurred in the result, but he dissented from the "fair value" doctrine of *Smyth* v. *Ames* and urged the court to adopt as the standard for measuring the reasonableness of rates the so-called "prudent investment" rule. According to Bauer and Gold, Public Utility Valuation, p. 88, "the minority opinion of Judge Brandeis, whatever one may think of it conclusions in support of 'prudent investment,' is generally recognized as the ablest presenta-

tion of the basic economic issues involved in valuation for rate making that has ever been delivered from the bench." Yet it failed to detour the majority of the court from its rigid adherence to the "fair value" rule.[2]

Another landmark case in the development of a standard for testing the reasonableness of utility rates is the case of *Los Angeles Gas & Electric Co.* v. *Railroad Commission of California,* 1933, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180. This case marks a turning point in the application of the "fair value" rule of *Smyth* v. *Ames.* It hinges upon the recognized distinction between the function of the courts and the legislatures in the regulation of utility rates. In this case the California Commission expressly stated that it had adhered to an "historical-cost" base and the court affirmed the Commission. Mr. Justice Butler dissented because he believed that the adherence to "historical-cost" rate base was contrary to prior court opinions.

This case was followed in 1934 by the case of *Lindheimer* v. *Illinois Bell Telephone Company,* 292 U. S. 151, 54 S. Ct. 658, 78 L. Ed. 1182. The lower court had applied the orthodox "fair value" formula to the case and reversed the

---

[2]Justice Brandeis stated:

"The so-called rule of *Smyth* v. *Ames* is, in my opinion, legally and economically sound. The thing devoted by the investor to the public use is not specific property, tangible and intangible, but capital embarked in the enterprise. Upon the capital so invested the federal Constitution guarantees to the utility the opporunity to earn a fair return.

\* \* \* \* \*

"The investor agrees, by embarking capital in a utility, that its charges to the public shall be reasonable. His company is substituted for the state in performance of the public service, thus becoming a public servant. The compensation which the Constitution guarantees is an opportunity to earn the reasonable cost of conducting the business. Cost includes not only operating expenses, but also capital charges. Capital charges cover the allowance, by way of interest, for the use of the capital, whatever the nature of the security issued therefor, the allowance for risk incurred, and enough more to attract capital." [262 U. S. 276, 43 S. Ct. 547, 67 L. Ed. 981, 31 A. L. R. 807.]

Commission's order on the ground that the rates established were confiscatory. The Supreme Court concerned itself primarily with the experience of the Company under the new rates and concluded that the rates were not confiscatory. The court set aside the fair value findings and concluded:

"* * * this actual experience of the company is more convincing than tabulations of estimates. In the face of that experience, we are unable to conclude that the company has been operating under confiscatory intrastate rates. * * * The glaring incongruity between the effect of the findings below as to the amounts of return that must be available in order to avoid confiscation and the actual results of the company's business makes it impossible to accept those findings as a basis of decision." Page 163 of 292 U. S., page 663 of 54 S. Ct., 78 L. Ed. 1182.

The case of *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio,* 292 U. S. 290, 311, 54 S. Ct. 647, 78 L. Ed. 1267, affords a further example of the courts inclination to look to the result of the rate order rather than to the method.[3]

---

[3]It was in this case that the court speaking through Justice Cardozo stated: "Dissection of the several items that have been criticized in the appellant's argument has thus brought us to the conclusion that the order of the commission, whether generous or ungenerous, is at all events not confiscatory, and hence not subject to revision here. But the conclusion has reinforcements that come to it from other avenues of approach. In a statement put in evidence by the appellant, the rate of return under the new schedule is said to be 1 28/100 per cent of the fair value of the property. Under the earlier schedule the revenue was even less. So modest a rate suggests an inflation of the base on which the rate has been computed. It is a strain on credulity to argue that the appellant, when putting into effect a new schedule of charges, was satisfied with one productive of so meager a return." [292 U. S. 290, 54 S. Ct. 657, 78 L. Ed. 1267.]

See also *West* v. *Chesapeake & Potomac Telephone Co.,* 1935, 295 U. S. 662, 55 S. Ct. 894, 79 L. Ed. 1640, in which Mr. Justice Stone said in his dissenting opinion that: "In assuming the task of determining judicially the present fair replacement value of the vast properties of public utilities, courts have been projected into the most speculative undertaking imposed upon them in the entire history of English jurisprudence." Page 689 of 295 U. S., page 905 of 55 S. Ct., 79 L. Ed. 1640.

Two other cases are worthy of note in the development of the law in this regard. They are *Denver Union Stock Yard Co.* v. *United States,* 1938, 304 U. S. 470, 58 S. Ct. 990, 82 L. Ed. 1469, and *Driscoll* v. *Edison Light & Power Co.,* 1939, 307 U. S. 104, 59 S. Ct. 715, 83 L. Ed. 1134. In the latter case the court upheld an order made under a temporary rate statute of Pennsylvania. The rates were held to be nonconfiscatory on the ground that they yielded a fair return on a value at least as high as the depreciated reproduction cost. Mr. Justice Frankfurter, in an opinion concurred in by Mr. Justice Black, concurred in the result reached by the majority but added: "* * * The Court's opinion appears to give new vitality needlessly to the mischievous formula for fixing utility rates in *Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819. The force of reason, confirmed by events, has gradually been rendering that formula moribund by revealing it to be useless as a guide for adjudication. * * *" Page 122 of 307 U. S., page 724 of 59 S. Ct., 83 L. Ed. 1134. The Denver Stock Yard case is of interest because of the fact that it was decided during a period when it appeared that important limitations were being placed on the "fair value" doctrine of *Smyth* v. *Ames,* yet it emphatically laid down the rule that "as of right safeguarded by the due process clause of the Fifth Amendment, appellant is entitled to rates not per se excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of property used, at the time it is being used, to render the services." Citing several of the cases discussed above.

This brings us to the case of *Federal Power Commission* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, 62 S. Ct. 736, 86 L. Ed. 1037, decided in 1942. Much could be written in the analysis of this case, but we must forego a lengthy discussion in an attempt to hold this opinion within reasonable bounds. Robert L. Hale, in an article appearing in 55 Harvard Law Review 1116, entitled "Does the Ghost of Smyth v. Ames Still Walk?" makes a detailed study of the opinion and many of the earlier cases leading up to it.

After a detailed analysis, Hale concluded that in spite of the statement by Black, Douglas, and Murphy that "We think this is an appropriate occasion to lay the ghost of *Smyth* v. *Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, which has haunted utility regulation since 1898," that insofar as the Natural Pipe Line case is concerned, the "ghost of *Smyth* v. *Ames* still walks, and utility regulation continues to be enveloped in its fog."

At this point it may be noted that a majority of the members of the Supreme Court as constituted in 1942 had at one time or another expressed views contrary to those adhered to in the cases applying the fair value rule of *Smyth* v. *Ames.* See Mr. Justice (now Chief Justice) Stone's dissent in *West* v. *Chesapeake & Potomac Tele. of Baltimore,* 295 U. S. 662, 55 S. Ct. 894, at page 901, 79 L. Ed. 1640; Mr. Justice Frankfurter's concurring opinion in *Driscoll* v. *Edison Light & Power Co.,* 307 U. S. 104, 59 S. Ct. 715, 724, 83 L. Ed. 1134; and the opinion of Mr. Justices Black, Douglas, and Murphy in *Federal Power Commission* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, 62 S. Ct. 736, 86 L. Ed. 1037. Further in at least four decisions the court had indicated that it was more concerned with the results under the rates prescribed than with the method pursued by the Commission in fixing rates. See *Los Angeles Gas and Elec. Corp.* v. *Railroad Commission of California,* 1933, 289 U. S. 287, 53 S. Ct. 637, 77 L. Ed. 1180; *Lindheimer* v. *Illinois Bell Telephone Company,* 1934, 292 U. S. 151, 54 S. Ct. 658, 78 L. Ed. 1182; and *Dayton Power & Light Company* v. *Pub. Utilities Commission of Ohio,* 1934, 292 U. S. 290, 54 S. Ct. 647, 78 L. Ed. 1267; *Federal Power Commission* v. *Natural Gase Pipeline Co.,* 1942, 311 U. S. 575, 62 S. Ct. 736, 86 L. Ed. 1037. Thus in spite of decisions such as the Denver Union Stock Yard case, supra, and the *West* v. *Chesapeake & Potomac* case, supra, the departure of the Supreme Court from the fair value doctrine of *Smyth* v. *Ames* in January, 1944, in the case of *Federal Power Commission* v. *Hope Natural Cas Company,* 320

U. S. 591, 64 S. Ct. 281, 88 L. Ed.—, did not come entirely by surprise.

The Hope case involved a petition by the Hope Natural Gas Company to review an order of the Federal Power Commission under the various provisions of the Natural Gas Act of 1938, 52 Stat. 821, 15 U. S. C. A. § 717 et seq. That Commission, after hearing, ordered a rate reduction to reflect a certain specified decrease in operating revenues. Sec. 4 of the Natural Gas Act provided that all rates and charges made for the transportation or sale of natural gas subject to the jurisdiction of the Federal Power Commission "shall be just and reasonable, and any such rate or charge that is not just and reasonable" is declared to be unlawful. Sec. 5 authorized the same Commission to determine the just and reasonable rate and to reduce rates whenever "existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

Sec. 6 (a) provided that the same "Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property."

The Federal Power Commission arrived at a rate base predicated upon the amount found by it to be "prudently invested" in the property devoted to public service. It found that Hope's estimates of reproduction cost and trended original cost were without probative value and ignored them. No consideration was given to the change in price levels occurring since the construction or acquisition of the properties. Upon the rate base so determined the Commission allowed a return of 6½%. The Circuit Court of Appeals in an opinion reported in 4 Cir., 134 F. 2d. 287 found that the rates allowed "must be condemned as unreasonable and confiscatory because  *  *  *  the [Federal Power] Commission did not find the present fair value

of the property and took no account of the change of price levels in determining the rate base;  *  *  *."

At page 296 of 134 F. 2d the Circuit Court of Appeals said that "It must not be forgotten that it is the property owned by the utility, and not the cash invested by stockholders in its stock, that is devoted to public use; that this property is worn out in furnishing the service which the public receives and which the utility is bound to render; and that, unless the utility receives a rate sufficient to make necessary replacements at current prices with a fair return upon the present fair value of its investment, its property is being taken from it and given to its customers." It went on at page 298 of 134 F. 2d, to hold that "original investment cost cannot be taken alone as a measure of the present fair value of the property  *  *  *." Many of the "present fair value" cases were discussed.

Certiorari was granted by the United States Supreme Court. In an opinion reported in 320 U. S. 591, 64 S. Ct. 281, 287, 88 L. Ed.—, handed down on January 3, 1944, the court reversed the Circuit Court of Appeals and upheld the rate order based solely on "prudent investment" evidence. The quotation set out in the margin[4] shows the extent of the

---

[4]"When we sustained the constitutionality of the Natural Gas Act in the Natural Gas Pipe Line Company case, we stated that the 'authority of Congress to regulate the prices of commodities in interstate commerce is at least as great under the Fifth Amendment as is that of the states under the Fourteenth to regulate the prices of commodities in intrastate commerce.' 315 U. S. at page 582, 62 S. Ct. at page 741, 86 L. Ed. 1037. Rate-making is indeed but one species of price-fixing. *Munn* v. *Illinois*, 94 U. S. 113, 134, 24 L. Ed. 77. The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. *Block* v. *Hirsh*, 256 U. S. 135, 155-157, 41 S. Ct. 458, 459, 460, 65 L. Ed. 865, 16 A. L. R. 165; *Nebbia* v. *New York*, 291 U. S. 502, 523-539, 54 S. Ct. 505 (509-517), 78 L. Ed. 940, 89 A. L. R. 1469, and cases cited. It does, however, indicate that 'fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates

departure of the court from its earlier "present fair value" holdings.

The foregoing discussion regarding constitutional limitations is of necessity not complete. For more detailed analysis see Bauer and Gold, "Public Utility Valuation," 1934, pages 25 to 111, inclusive; Barnes, "The Economics of Public Utility Regulation," 1942, p. 370-403; Bondright, "Valuation of Property," 1937, pp. 1078-1110; Beutel, Valuation As A Requirement of Due Process, 43 Harvard Law Review 1249; Hale, "Does the Ghost of Smyth v. Ames Still Walk?," 55 Harvard Law Review 1116.

We need not here consider the economic merits of either the "prudent investment" or the "fair value" concept of rate making. In this regard see Barnes, Economics of Utility

---

cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

"We held in *Federal Power Commission* v. *Natural Gas Pipe Line Co.*, supra, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id., page 586 of 315 U. S., page 743 of 62 S. Ct., 86 L. Ed. 1037. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Id., page 586 of 315 U. S., page 743 of 62 S. Ct., 86 L. Ed. 1037. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. (Citing cases, including the dissenting opinion of Mr. Justice Stone in *West* v. *Chesapeake & Potomac Tel. Co.*, 295 U. S. 662, 692, 693, 55 S. Ct. 894, 906, 907, 79 L. Ed. 1640). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. (Citing cases.)"

Regulation, p. 545. ·The arguments for "prudent invest-ment" as against "fair value" have been set forth by various members of the Supreme Court upon several occasions.[5]

From the foregoing it becomes clear that the Supreme Court is now committed to the view that there is no con-stitutional requirement that utilities be permitted to earn a "fair return" on the "fair value" of the property devoted to the public use. The Hope case stands ■■ squarely for the doctrine that it is the final impact of the rate order which is controlling insofar as Federal constitutional limitations are concerned. So long as the rate set does not confiscate the property devoted to public service, the rate order will not be held to violate substantive constitutional principles. The legislature is free to determine its own economic policy in regard to the fixing of rates. Its power to set rates is, however, still circumscribed by two constitutional limitations: (1) substantive constitutional law requires that the rates finally set shall not be con-fiscatory; and (2) the requirements or procedural due process must still be followed.

The petitioner in its reply brief concedes that it has no claim for relief under the substantive constitutional law of the Federal Constitution. We have included the history and development of the Federal doctrine as a background for

---

[5]The "mischievous formula for fixing utility rates in *Smyth* v. *Ames*" has been criticized by various members of the court in the fol-lowing cases: *Driscoll* v. *Edison Light & Power Co.*, 307 U. S. 104, 122,· 59 S. Ct. 715, 83 L. Ed. 1134 (Frankfurter, J., concurring); *McCart* v. *Indianapolis Water Co.*, 302 U. S. 419, 423, 58·S. Ct. 324, 82 L. Ed. 336 (Black, J., dissenting); *Southwestern Bell Telephone Co.* v. *Public Service Commission*, 262 U. S. 276, 292, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807 (Brandeis, Holmes, JJ., concurring); *St. Louis & O'Fallon R. Co.* v. *United States*, 279 U. S. 461, 551, 552, 49 S. Ct. 384, 73 L. Ed. 798 (Brandeis, Holmes, Stone, JJ., dissenting); *West* v. *Chesapeake & Potomac Tel. Co.*, 295 U. S. 662, 680, 55 S. Ct. 894, 79 L. Ed. 1640 (Stone, Brandeis, Cardozo, JJ., dissenting); *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 606, 62 S. Ct. 736, 86 L. Ed. 1037 (Black, Douglas and Murphy, JJ., concurring).

what we shall hereafter say and as especially applicable in our consideration of the Company's contention that the Utah law requires the Commission to take value as the base and further in our consideration of the term "just and reasonable rates."

Our holding, and the Company's concession, that the legislature itself, under substantive constitutional law, would have had the power to ignore value and adopt in lieu thereof prudent investment in establishing a rate base, brings us to the Company's contention that even though the legislature itself does have such power, it did not delegate that power to the Public Service Commission. It contends that the doctrine of "fair value" as developed in *Smyth* v. *Ames* is embedded in the Utah statutes and that such statutes, aside from any constitutional limitations, require the Commission to bottom utility rates upon a "fair value" rate base.

If it were determined that the legislature of Utah had by the Utilities Act directed the Commission to use "value" as the rate base in arriving at just and reasonable rates, the fact the the Supreme Court of the United States has now departed from its earlier holding of *Smyth* ■ v. *Ames* would make no difference. A change in substantive constitutional law which now permits as constitutional the use of "prudent investment" as a rate base cannot eradicate from the statutes of this state a legislative mandate that rates be based on "value" if such mandate in fact exists in our statutes. In this regard see the holding and reasoning of *Peoples Natural Gas Co.* v. *Pennsylvania Pub. Utility Commission*, 153 Pa. Super. 475, 34 A. 2d 375.

The particular Utah statutes relied upon by the Company in support of this contention are sections 76-4-21 and 76-6-19, U. C. A. 1943. Section 76-4-21 provides:

"The commission shall have power to ascertain the value of the property of every public utility in this state and every fact which in its judgment may or does have any bearing on such value. The commission shall have power to make revaluations from time to time and to ascertain the value of new construction, extensions, and

additions to the property of every public utility; provided, that the valuation of the property of all public utilities doing business within this state located in Utah as recorded in accordance with section 76-4-21 of this chapter shall be considered the actual value of the properties of said public utilities in Utah unless otherwise changed after hearings by order of the commission. In case the commission changes the valuation of the properties of any public utility said new valuations found by the commission shall be the valuations of said public utility for all purposes provided in this chapter."[6]

The company contends that this section should be construed as a mandate to the Commission to find the value of public utilities and to use that value as a base for determining just and reasonable rates. Section 76-6-19 implements 76-4-21 and provides the procedure to be followed by the Commission in ascertaining value thereunder. Reliance is placed particularly on the following portion of Section 76-6-19:

"For the purpose of ascertaining the matters and things specified in section 76-4-21 the commission may cause hearings to be held at such times and places as the commission may designate. * * * All public utilities affected shall be entitled to be heard and to introduce evidence as such hearings. * * * The commission shall make and file its findings of fact * * *. The findings of the commission so made and filed * * * shall be admissible in evidence in any action, proceeding or hearing before the commission or any court in which the commission, the state or any officer, department or institution thereof, or any county, municipality or other body politic and the public utility affected may be interested, whether arising under the provisions of this title or otherwise, and such findings, when so introduced, shall be conclusive evidence of the facts therein stated, as of the date therein stated * * *. The commission may from time to time cause further hearings and investigations to be had for the purpose of making revaluations or ascertaining the value of any betterments, improvements * * * subsequent to any prior hearing or investigation * * *."

[6]In *State ex rel. Public Service Comm. v. Southern Pac. Co.*, 95 Utah 84, 79 P. 2d 25, we held that the language which follows the word "provided" (which language was added in 1937 by way of amendment) together with Section 76-4-21x were enacted in conjunction with Chapter 100, Laws of Utah 1937 to effectuate a single purpose and that both Chapter 87 (which amended Section 76-4-21 by adding the proviso and added section 76-4-21x) and Chapter 100, laws of Utah 1937 were unconstitutional.

The Company contends that this language shows a legislative intent to have rates based upon value and argues that if "cost" were to be taken in place of "value" there would be no necessity for or meaning to the language requiring revaluations from time to time.

We believe that these two statutes, even when lifted from the Act and considered by themselves, show that the legislature contemplated that there would be situations under which various departments of the state would find it necessary to know or to prove the value of a public utility. This is evidenced by the provision that the findings of value, when properly made, would be admissible in evidence in the various named proceedings in which the departments of the state or various bodies politic might be interested. This language indicates that these section (76-4-21 and 76-6-19) were not designed to require the Commission to find value for rate making purposes. Since the valuation findings were by statute made admissible in evidence in various types of proceedings and were to be conclusive in absence of a showing of changed conditions, etc., it is only logical that the statute would provide a procedure for revaluations from time to time to keep the valuation abreast of changing conditions.

There is nothing in Section 76-4-21 which requires that it be construed as a mandate to the Commission to base rates on value rate base. The provision that the "commission shall have power to ascertain the value" is not the equivalent of a provision that the "commission shall ascertain value." Nor is the provision that when the Commission finds new valuations "said new valuations * * * shall be the valuations * * * for all purposes" the equivalent of a provision that "value is to be used for all purposes." If this section stood by itself it might be susceptible of such an interpretation, when, however, it is considered in relation to other sections of the same chapter, it becomes fairly clear that it should not be so construed.

Section 76-4-1 gives the Commission general jurisdiction over every public utility in the state of Utah. The Commis-

sion is there given power "to supervise and regulate every public utility in this state, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction."

Section 76-4-2 authorizes the Commission to proceed upon its own motion to investigate any schedule of rates and charges. It is directed to fix a time and place for hearing and notify the utility concerning which such investigation is being made. Upon hearing it "shall make such findings and orders as shall be just and reasonable with respect to any such matter." Section 76-4-3 deals with rates of carriers. Section 76-4-4 provides that:

"Whenever the commission shall find * * * that the rates * * * are unjust, unreasonable, discriminatory or preferential, or in anywise in violation of any provision of law, or that such rates * * * are insufficient, the commission shall determine the just, reasonable or sufficient rates * * * and shall fix the same by order as hereinafter provided."

These sections give the Commission general jurisdiction over utility rates. They empower the Commission to do all things necessary to supervise and regulate every utility in this state. They provide that rates are to be just and reasonable and direct the Commission to fix just and reasonable rates by order after hearing. These sections are broad and sweeping in scope. The limitations placed on the exercise of full legislative powers by said sections are: first, that the Commission proceed by notice and hearing; and second, that the rates established conform to the standard of "just and reasonable." These sections contain no mandate that rates be based on a fair value rate base. We so stated in *State ex rel. Pub. Service Comm. v. Southern Pacific Co.*, 95 Utah 84, 79 P. 2d 25, 33 in the following words:

"Prior to the enactment of the challenged amendments [Chap. 87 and 100, Laws of Utah, 1937], the Public Service Commission had plenary power to regulate utilities and to fix rates which should

be fair and reasonable. There was no legislative requirement that the utility rates be based on the fair value of the property but only that they be fair and reasonable."

It may be, as contended by the Company, that this quoted matter was not strictly necessary to a decision in the Southern Pacific case, but it was a part of the rationale of the holding of the court. We think that it correctly stated the law.

The Company cites *Peoples Natural Gas Co.* v. *Pennsylvania Public Utility Commission*, 153 Pa. Super. 475, 34 A. 2d 375, as holding to the contrary. This cited case is based upon an earlier Pennsylvania decision, *Solar Electric Co.* v. *Public Utility Commission*, 137 Pa. Super. 325, 335, 336, 9 A. 2d 447. The portion of the Pennsylvania Utility law set out in that opinion is very similar to the opening sentence of Section 76-4-21 of the Utah Act. If this told the whole story the cases would not be distinguished. However, the provision construed by the Pennsylvania court is contained in Article III, 1937, Penn. Laws, 1053, 1070, 66 P. S. Pa. § 1141 et seq. The article heading under which it is found is entitled "Rates and Rate Making." Every subsection included within such article deals directly and expressly with rates. The valuation section itself is expressly related to rate making. It provides that the

"commission may, after reasonable notice and hearing, ascertain and fix fair value of the whole or any part of the property of any public utility * * * and ascertain the fair value of all new construction, * * * When any public utility furnishes more than one of the different types of utility service * * * the commission shall segregate the property used and useful in furnishing each type of such service and shall not consider the property of such public utility as a unit in determining the value of the property of such public utility *for the purpose of fixing rates.*" (Italics added.)

The location of the Pennsylvania valuation section under an article with a title relating only to rates; the fact that all other sections under said article deal directly with rates; and the reference in the valuation section to fixing rates furnish considerable support for the Pennsylvania Court's

holding that the statutes required the Commission to base utility rates on a value rate base. It is upon these factors that we think the two statutes differ.

The Company has advanced various other arguments in support of its contention that the Utah valuation section (76-4-21) must be construed as a mandate to the Commission to bottom rates upon a value rate base.

First, the Company contends that the Utah Act was copied from the Public Utility Act of Idaho and that the Supreme Court of Idaho in *Murray* v. *Public Utilities Commission*, 27 Idaho 603, 150 P. 47, L. R. A. 1916F, 756, prior to the date when Utah allegedly copied the ■ Idaho Act, had construed the valuation section of the Idaho Act as a mandate to the Commission to fix rates on a value rate base. The Commission countered that the Utah Act was adopted from and patterened after the California Act. The only importance attached to the argument that the Utah Act was copied from the statutes of Idaho raher than from the statutes of California or vice versa is this: When statutes of another state are adopted, it is assumed that the prior construction placed upon such adopted statutes by the courts of the other state is also adopted. See *Fuller-Toponce Truck Co.* v. *Pub. Ser. Comm.*, 99 Utah 28, 96 P. 2d 722; *Norville* v. *State Tax Commission*, 98 Utah 170, 97 P. 2d 937, 126 A. L. R. 1318, and cases cited. The company seeks to invoke this principle. It contends that in *Murray* v. *Pub. Ser. Comm.*, supra, decided prior to adoption of Utah Act, the Idaho Supreme Court held that the Idaho Act which is identical with Utah Act *required* the Commission to fix utility rates upon a fair value rate base. The Company also urges that the Supreme Court of California in *San Joaquin Light & Power Co.* v. *Railroad Commission*, 175 Cal. 74, 165 P. 16, under the California Act, which was at that time (1917) identical with the present Utah Act approved a fair value rate base. The Company concludes: "It is plain that when the Utah law was enacted both California and Idaho were definitely committed to the value rule for rate-making purposes."

While the Idaho court in *Murray* v. *Public Service Commission* [27 Idaho 603, 150 P. 50, L. R. A. 1916F, 756] referred to a "fair and safe return on * * * investment" it is clear that the court purported to follow the rule of *Smyth* v. *Ames* for the fixing of utility rates. It held that there was error in the refusal of the Idaho Commission to find the present fair value of a water right. The Idaho Commission had ignored value and allowed the utility only the cost of acquiring the water right. The court stated: "The value to be considered by the commission is the present, fair value of the water right at the time the rate is fixed. The original cost is not at all conclusive, if it can be shown that it now has a different value, although the original cost is, as in all cases, an element which may be considered." But the opinion of the court was placed on constitutional requirements rather than upon the requirements of the Idaho Public Utility Act. The section of the Idaho Act, Sec. 59-523, Idaho Code 1932, which is identical to the provision of the Utah Act relied upon by the Company is not even cited. The case, while showing that the Idaho Court adhered to the fair value of rule of *Smyth* v. *Ames,* does not show that Idaho Court had construed the comparable Idaho statute as a legislative mandate to the Commission to fix utility rates on a fair value rate base. The case does not, therefore, aid us in construing the Utah Act. The same is true of *San Joaquin Light & Power Corp.* v. *Railroad Comm.,* 175 Cal. 74, 165 P. 16, supra. The court there approved rates predicated upon a fair value rate base, but in so doing did not place its holdings on particular statutes. There is no intimation in the opinion that the Court believed that the legislature had by statute required the Commission to use fair value as the rate base.

The Company's second argument designed to have us construe the Utah Act as a directive to the Commission to fix rates in relation to fair value is that the Utah Commission has consistently so construed the statutes and that such administrative interpretations are entitled to great weight. The proposition of law implicit in this argument is well settled. Consistent administrative

interpretations over the years by the officers charged with the duty of applying the statute and making each part work efficiently and smoothly are entitled to great weight by the courts. *United States* v. *American Trucking Ass'n*, 310 U. S. 534, 60 S. Ct. 1059, 1067, 84 L. Ed. 1345, 1356; *State Board of Land Commissioners* v. *Ririe*, 56 Utah 213, 190 P. 59; *Mutart* v. *Pratt*, 51 Utah 246, 170 P. 67; *Decker* v. *New York Life Ins. Co.*, 94 Utah 166, 76 P. 2d 568, 115 A. L. R. 1377; *Murdock* v. *Mabey*, 59 Utah 346, 203 P. 651; In re *Lambourne's Estate*, 97 Utah 393, 93 P. 2d 475.

Closely allied to this argument is the third argument in which the Company seeks to invoke the principle of law that when the legislature re-adopts a statute or act without change after uniform and notorious construction by officers required to administer it the presumption is that the legislature knew of such construction and adopted it in re-enacting the statute. This doctrine has been criticized (see 54 Harvard Law Review p. 1311, Article by A. H. Feller) but it nevertheless is supported by considerable authority. *State Board of Land Commissioners* v. *Ririe*, supra, 56 Utah 213, 190 P. 59; *Van Veen* v. *Graham County*, 13 Ariz. 167, 108 P. 252; *City of Louisville* v. *Louisville School Board*, 119 Ky. 574, 84 S. W. 729; *State* v. *Sheldon*, 79 Neb. 455, 113 N. W. 208.

The Commission contends that these principles have no application because it contends the Utah Act has not been uniformly construed as a mandate from the legislature to fix utility rates on a fair value rate base. The Company takes the position that "from the beginning of 1917 down to and including the filing of its original complaint in the case now under review, [the commission has] adhered consistently to the rule that the value of property devoted to the public service must be ascertained as a rate base." The Company cites 23 cases decided by the Utah Commission in which the fixing of rates was involved and it contends that in every one of these cases the Commission adhered to a fair value rate base.

We have examined each of the 23 cases cited. From them it appears that the Commission has in the past consistently adhered to the fair value rule of *Smyth* v. *Ames*. Statements similar to the following taken from In the Matter of the Application of the Utah Gas and Coke Company, case No. 233, 3 R. P. U. C. 75 are found throughout the discussions in many of these cases:

"The Commission takes occasion to say that it is in full harmony with the well established and economically correct rule that public service corporations should be permitted to earn 'a fair return upon the reasonable value of the property at the time it is being used for the public.' "

Yet not one of these cases construed the Public Utilities Act of Utah as a mandate to the Commission to fix utility rates on a fair value rate base. In fact in case number 6; In Re Application of the Utah Light & Traction Company, the Commission concluded that "when the Legislature enacted the Public Utilities Commission Law, its intention was to delegate all its power in respect to rate regulation to such Commission. That was one of the chief reasons for the creation of the Public Utilities Commission." It is apparent that the Commission thought the limitation placed upon the rate making power of the Commission, which limitation required the Commission to fix rates upon a fair value rate base, was a restriction upon legislative power by principles of substantive constitutional law. So that while the Commission throughout its various opinions adhered to the fair value rule of *Smyth* v. *Ames,* it indicated that it did so because it understood that it was required to do so by the court decisions applying constitutional law. The cases cannot be construed as holding that the Public Utilities Act contained a mandate to the Commission to fix rates on a fair value rate base.

In case number 87, 2 R. P. U. C. 27, In re Application of the Utah Gas & Coke Company, the Commission did discuss the language (Sec. 76-4-21) relied upon by the Com-

pany. However, the Commission did not say that this language required the Commission to find value and fix rates upon a fair value rate base. What the Commission did say was that: "In determining just and reasonable rates, the basis of calculation is the fair value of the property used and useful for the convenience of the public. The authority granted to the Commission to ascertain the value of public utilities is contained in Sec. 18 of Article 4, Chapter 47, Compiled Laws of Utah, 1917( quoting it)." (This section was identical with 76-4-21 relied upon by the Company.) The Company would have us construe this language to say that "The Commission is *required by this section* to find value and fix rates upon a fair value rate base." We think it apparent from the whole of this case that the Commission believed that the mandate to fix rates on value came from the court decisions which followed *Smyth* v. *Ames* and that the statute was but the authorization, the delegation of power, to the Commission empowering it to undertake procedure to ascertain value; that the mandate came not from the legislature, but from the courts.

The situation in respect to the Commission cases is this: The Commission has consistently approved the fair value rule of *Smyth* v. *Ames*. Its former opinions indicated that it did so because it interpreted the various federal and state court decisions as requiring it. In one case the Commission interpreted the Public Utilities Act as an attempt by legislature to delegate all its rate making power to the Commission. None of these cases construed the *act* as a mandate to fix rates on a value rate base. When the substantive constitutional limitation imposed by the United States Supreme Court in *Smyth* v. *Ames* was removed, the Commission, insofar as its past decisions were concerned, could consistently and logically hold that it was no longer required to fix utility rates in accordance with the rule of *Smyth* v. *Ames*.

The Company next points out that when the Utah Public Utilities Act was enacted in 1917, constitutional substantive

law required adherence to the fair value principle of rate making. It contends that it must therefore be held that the Utah Act was enacted in reference to and incorporated the constitutional restriction of the fair value rule of *Smyth* v. *Ames*. If the legislature by statute had expressly restricted the powers of the Commission to conform with the prevailing rule of constitutional law, this last mentioned factor would be a logical explanation of such restriction. But the fact that such constitutional restrictions existed at the time of the enactment is hardly justification for construing the Act narrowly. It is equally logical to hold that the legislature intended to delegate *all* the powers of rate making to the Commission that it could constitutionally delegate subject only to express statutory restrictions. The removal of the constitutional barrier erected by *Smyth* v. *Ames* unleashed the power of the Commission and permitted it to expand into fields previously restricted by earlier court decisions.

The statute cannot be construed as requiring the Commission to fix utility rates on a value rate base. The legislature gave full rate making power to the Commission subject only to the limitations of procedural due process and the requirement that rate established be just and reasonable. This standard "just and reasonable" has been held to be the same as the constitional standard. *Federal Power Commission* v. *Natural Gas Pipeline Co.*, supra, 315 U. S. 575, 62 S. Ct. 736, 86 L. Ed. 1037. At the time of *Smyth* v. *Ames* a rate could not be just and reasonable in the constitutional sense unless it permitted a fair return on fair value. This concept has, as pointed out above, been overruled. It would be contrary to common sense to hold that the legislature meant "just and reasonable" only as defined by the courts at the time of *Smyth* v. *Ames* and to hold that the legislature would, in order to authorize the Commission to use prudent investment, be required to re-enact the statute saying that it meant "just and reasonable" as that term is construed today. To the contrary, it must be assumed that the legislature contemplated that

the concept of that which is "just and reasonable" might change with social trends. Possibly that is why the legislature did not prescribe a definite formula to be applied to every case without variation. The term "just and reasonable" is not an absolute. The legislature need not amend the statute to permit the Commission to apply the present judicial interpretation of what is "just and reasonable." The Commission did not err in refusing to fix rates upon a fair value rate base.

The Company next contends that even though it be determined that the Commission had the authority to discard the "fair value" theory and to substitute therefor "prudent investment" in ascertaining the proper base for fixing utility rates, the Commission nevertheless erred in excluding from the "prudent investment" base certain items of cost. The specification of error has been divided by counsel into four parts for the purpose of discussion. Exception is first taken to the exclusion from the rate base of certain fees (hereinafter referred to as "Phoenix Fees") paid by the Company to affiliate companies for construction of electric plant.

### Phoenix Fees

In addition to the acquisition by the Company of the electric properties of 46 other companies, the Company undertook considerable new construction. Substantially all of the heavy construction between the date of the organization of the Company and 1936 was done by the Phoenix Companies.[7] The Phoenix Companies were wholly owned by Electric Bond & Share Company. These Phoenix Companies performed construction work for various Electric Bond & Share affiliate companies throughout the country, including Utah Power & Light Company, on a cost-plus basis.

---

[7]"Phoenix Companies" refers to Phoenix Construction Company (a Connecticut corporation, the name of which was changed in 1918 to Phoenix Utility company) and to Phoenix Engineering Company which was organized in 1933 and which took over the business and operations of Phoenix Utility Company.

Under the terms of these cost-plus contracts, the Company paid to the Phoenix Companies all the costs of construction plus additional fees averaging about 3¼% of total cost. The Commission found that the fees so paid by the Company to the Phoenix Companies constituted inter-company profits and concluded that these amounts paid as profits to affiliate companies could not be properly included in the rate base. The amount paid to the Phoenix Companies and thus excluded from the rate base was $997,472.27.

There is no evidence to show that the fees thus paid to the Phoenix Companies were exorbitant. The work was properly and skillfully done. There is nothing to indicate that the work could have been done more cheaply or efficiently had the work been let to nonaffiliated construction concerns under competitive bidding. The Company at the time when the work was done did not have the facilities to do the work for itself. Had the work been let to other nonaffiliate concerns, similar costs would have been incurred. It thus appears that the sole ground for the exclusion from the rate base of the Phoenix fees was that said fees represented profits to affiliates and as such were not properly includable.

The Commission urges that in this regard the corporate entities of these various affiliate corporations must be disregarded and that these payments to Phoenix Companies should be in substance considered as payments by the Company to itself. It would appear self-evident that had the Company had its own construction department which had done this construction work, it could not have paid itself a profit nor had profits included in the rate base. This would be true regardless of how cheaply or efficiently the work was done. The Company could not pyramid its rate base by including therein profits paid by it to itself.

The situation would be little changed by placing a corporate veil between the Company and its construction department. If the incorporated construction department were still fully owned and controlled by the Company,

it would essentially still be a case where the parent would be doing the construction work for itself. This would be especially true if the subsidiary corporation had no separate substantial assets or capital of its own. The amount of capital devoted to the public service would remain unchanged. There would be no justification to add anything to the rate base over and above the actual cost of construction. We need not consider the situation under which the subsidiary corporation has substantial separate assets of its own, for as will be subsequently noted, the Phoenix Companies had no assets. In the case of a "dummy" corporation organized without substantial assets of its own to do construction work for the parent corporation there is no reasonable basis as far as rate making is concerned upon which it could be paid anything more than actual costs. Any profits paid to it would redound to the benefit of the parent corporation with the result that the profits would in effect be returned to the parent corporation. If this expenditure by the parent to pay the subsidiary a profit were also written into the rate base so that it could be recouped from the public the parent corporation would in effect have its cake and eat it too. Such fictitious "write-ups" should not be permitted.

The underlying principle is not changed by the addition to the picture of a holding company (Electric Bond & Share) which owns both the construction corporation and the operating utility. *Alabama Power Co.* v. *Federal Power Commission,* 5 Cir., 134 F. 2d 602.

It was admitted on behalf of the Company by counsel that the Phoenix Companies were in effect the construction department of Electric Bond & Share Company; that Electric Bond & Share functioned through the Phoenix Companies. The Phoenix Companies were organized primarily for the purpose of enabling the parent company (Electric Bond & Share) to in effect qualify to do business under the laws of the various states and to provide a method of segregating the accounts for construction work from its other business. No attempt was made to hold the Phoenix Companies apart

as distinct entities from Electric Bond & Share. The payments of these profits (Phoenix Fees) to the Phoenix Companies was in effect a payment direct to Electric Bond & Share.

The Commission held and the evidence discloses that the Phoenix Companies had no assets of their own. The Phoenix Utility Company, successor to other Phoenix Companies, had only nominal capitalization and substantially no direct overhead costs or administrative organization distinct from that of Electric Bond & Share Company. With this nominal capitalization (only 20 shares of outstanding stock valued at $100 per share) the Phoenix Companies completed nearly $37,000,000 in construction for its associate, the Utah Power & Light Company. In view of the evidence showing that every service rendered by Electric Bond & Share Company was billed as an item of cost; that all employees were compensated by the Company; that part of the overhead expense of New York offices was allocated to the Utah construction; and the further fact that there were no assets or employees of Electric Bond & Share that were shown to have been devoted to or employed in connection with construction for the Company which were not paid for by the Company, we cannot hold that the Commission was arbitrary in refusing to include in the rate base an aditional amount representing additional payments to Electric Bond & Share Company in connection with this construction.

The Phoenix Companies operated in the field with the assets of the operating utility for which the work was being done. Thus while the $37,000,000 in construction was being done for the Company, it was in reality done with the company's assets. It was as though the Electric Bond & Share Company had loaned its construction department to the Company in the same way as it might loan a skilled employee. The salaries of all employees of the Phoenix Companies who were connected with the construction for the Company were paid by the Company, as were all other labor costs. A proportionate share of overhead and office

expenses was allocated to the cost of the jobs being done for the Company. Phoenix purchased materials in the Company's name and for its account. There is no evidence which would even raise an inference that any assets of the Electric Bond & Share Company or any other affiliate were used without compensation in construction of Utah plant.

The position taken by the Company regarding the failure of the Commission to include these Phoenix fees in the rate base is not new to the courts. A similiar contention was made in *Pennsylvania Power & Light Co.* v. *Federal Power Comm.*, 3 Cir., 139 F. 2d 445, 450. The Phoenix Companies had done construction work for the Pennsylvania Power & Light Company and were paid cost-plus a 3% fee. The Federal Power Commission refused to include the amounts expended in paying this 3% fee in the rate base. In holding that the Commission had not erred the Court stated:

"The facts of the present case justify the Commission's conclusion that a close relationship existed in the Electric Bond and Share holding company system among the licensee (Pennsylvania Power & Light), Phoenix and Electric Bond and Share. Since the incorporation of Phoenix in 1906 as a construction company Electric Bond and Share has owned its total outstanding stock of 20 shares having a par value of $100 each. Aside from its name Phoenix has no genuine corporate existence. It operates with no funds of its own, has no construction equipment, no officers or employees of its own but only such as are supplied by Electric Bond and Share or by the operating companies, and pays none of their salaries. It operates only within the Electric Bond and Share system and obtains none of its contracts as a result of competitive bidding.

\* \* \* \* \*

"Phoenix and the licensee are thus both puppets in the Electric Bond and Share system. Moneys paid by the licensee to Phoenix at the behest of Electric Bond and Share and designated as a fee for construction work might without altering the essential nature of the transaction have been paid by the licensee directly to the corporation which pulled the strings, Electric Bond and Share. The Commission was amply justified in its conclusion that by reason of the control exercised by Electric Bond and Share over both Phoenix and the licensee and the intercorporate relationship there was no arm's length dealing in the arrangement whereby the licensee agreed to pay Phoenix

a fee of 3% of the cost of constructing the project. The fee thus exacted by Electric Bond and Share for its corporate dummy was not a legitimate item of cost."

Certiorari was denied by the United States Supreme Court in 321 U. S. 798, 64 S. Ct. 938, 88 L. Ed.——. To the same effect see *Alabama Power Co.* v. *Federal Power Commission*, 5 Cir., 134 F. 2d 602; *Alabama Power Co.* v. *McNinch*, 68 App. D. C. 132, 94 F. 2d 601; *Colorado Interstate Gas Company* v. *Federal Power Commission*, 10 Cor., 1944, 142 F. 2d 943.

### Organization Expense

The next major item which the Company contends was improperly excluded from the rate base is an amount which was expended by the Company for organization services rendered by Electric Bond & Share Company. There is no dispute concerning the fact that a sum in excess of $350,000 was actually paid by the Company to Electric Bond & Share Company. The Company admitted that it could not support or prove the considerations for such payment but contends that it was all properly paid for services actually rendered. The Company contends that the Commission allowed only $595.75 for organization expenses. This same point was argued to the Commission. In its report the Commission said that the Company was in error "wherein its states that the Staff has allowed only $595.75 for organization expense. The record is clear that $47,000 has been included in plant accounts for the cost of promotion and organization services. The contention that estimated amount of $350,000 should be allowed appears to be an attempt to justify an amount appearing on the Company's books which is an improper write-up and not cost of organization."

From the record it appears that the Commission did allow approximately $47,000 for organization expenses. This fact was acknowledged by witness Richard H. Jones who testified for the Company. There is no satisfactory evidence from which this court could conclude that the

Commission was arbitrary or that this was an insufficient allowance. Counsel for the Company admitted that the $350,000 estimate claimed by the Company could not be supported by documentary evidence. On the bill to the Company there was a $310,000 item identified only as "Promotion Services, Electric Bond and Share Company." This item is also referred to as an "award" to Electric Bond & Share Company. In a letter by L. B. Weigers, secretary and treasurer of Electric Bond & Share Company, it is reported that said Company could not give a more detailed explanation of the amounts "awarded" to it. Under this state of the record we are not prepared to hold that the Commission was arbitrary in not allowing more.

### Preferred Stock Expense

Exception is also taken to the fact that the Commission refused to include in the rate base sums expended in the promotion of sales of preferred stock. These sums total over $1,000,000. The largest single item contained therein is the sum of $791,000 which was paid to the Utah Securities Corporation (an Electric Bond & Share subsidiary) as compensation for selling preferred stock to the Electric Bond & Share Company. The intercorporate relationship between these three corporations was such that we cannot hold that the Commission was arbitrary in refusing to include this item. Stripped to the bare facts, the Company paid to an affiliate $791,000 as compensation for that affiliate's work in inducing a third affiliate, Electric Bond & Share Company, to purchase this preferred stock. From the record the conclusion is inescapable that one group of men formulated the policies for all three companies and determined that Electric Bond & Share should buy this preferred stock from the Company and that the sale should be made through another affiliate to enable the system to drain off this large sales commission. The Commission was not required to include the amounts so paid in the rate base.

Various other amounts expended in the sale of preferred stock and excluded from the rate base fall in a different class. At least a portion of these other amounts was properly expended. They undoubtedly represent legitimate expense of financing the Company. The Commission did not hold to the contrary. It excluded these items on the theory that they were expenditures that added nothing to the property of the corporation; that they should be considered as items of expense to be recovered from revenues, and that they should not be included in plant account. It took the view that since these items of expenditure did not represent tangible plant assets they should be recovered by the utility out of the return earned on its property. We are thus confronted with the question of law: Has the utility a right to have the cost of the issuance and sale of its preferred stock included as a plant asset in the rate base upon which it will be permitted to earn a fair return?

The Commission quoted from the report by the National Association of Railroad Utility Commissioners (1936, 48th Annual Convention) in connection with the adoption of the present Uniform System of Accounts as a basis for refusing to include this preferred stock expense in the rate base. This quotation follows:

" 'Commissions and expenses on the issuance and sale of preferred stock do not give rise to property and should not be included in the utility plant accounts of the utility. Such items represent a cost of money and should be recovered by the utility out of the return earned on its property. There is essentially no difference between commissions and expenses on capital stock issues and discount and expense on bond issues. Both represent a cost of money to the utility. The amortization of bond discount and expense has been rightfully considered a part of the interest cost of the issue and as such has been considered recoverable out of the return earned on the property. Commissions and expenses on capital stock should be treated in the same manner.' "

Two witnesses (Gadsby and Jones) for the Company testified that they did not believe that this expense of issuing and selling preferred stock should be included as

a factor both in establishing the rate of return and in the rate base—that it should only be included in one of these two places.

Gadsby referred to the cost of selling preferred stock as one of the arguments for a higher rate of return. On the other hand, witness Thain for the Commission testified that this preferred stock expense would have been properly included in plant account in 1934 when a different system of accounting was used and that its present removal from the plant account was because of a change in accounting systems.

As we view this problem it appears that the expenses of issuing and selling preferred stock cannot be included in the rate base and also be taken into account in fixing the rate of return. Further, that if they be once recouped from the public, they should no longer be included in either place. But until once recouped from the public and if legitimate items of expense, and some of these were, it would appear that the Company should be allowed to include these expenses as a part of the rate base or in the alternative to recover said expenses out of the return earned on its property. No cases have been cited by either the Commission staff or by the Company which deal with this problem. However, since the expenses do not represent property nor tangible assets in the Company, we are of the opinion that the Commission should not be *required* to include such items in the rate base. This is essentially a problem in accounting and as such should be left to the discretion of the Commission.

### System Cost of Leased Property

The last specific item which the Company contends was improperly excluded from the rate base relates to system cost of properties leased from Utah Light & Traction Company. The Utah Light & Traction Company was organized in 1914 by the Electric Bond & Share group to acquire the properties of the Utah Light & Railway Company and the Salt Lake Light & Traction Company. These two latter companies were controlled by

the Oregon Short Line Railroad Company through the ownership of stock and securities. Through negotiations with the Oregon Short Line Railroad group the Utah Light & Traction Company acquired all of the property and assets of the Utah Light & Railway Company and the Salt Lake Light & Traction Company. The properties thus acquired consisted of electric properties, a street railway system, certain artificial gas properties, and steam heating properties.

The Company entered into a lease agreement with the Traction Company under which the Company leased the electric properties thus acquired. The problem arose as to how these leased properties were to be represented in the rate base of the Company. In the case of all other properties acquired by the Company system cost (the cost of acquisition paid by the first company in the Electric Bond & Share group) was recommended by the Commission's staff and adopted by the Commission as the correct rate base. For this reason the Company contends that the Commission should have included this leased property at the actual cost paid by the Traction Company for the property when it was purchased from the Oregon Short Line Railroad Company group. This, the company contends, would have been the equivalent of allowing system cost. The Commission refused to adopt this view and in lieu thereof allowed only the original cost of constructing said properties. By allowing original cost rather than system cost, all intangibles such as good will, going concern value, etc., were eliminated. Only the actual original cost of constructing the physical properties was allowed. There was a difference of $1,800,-000 between the Company's claimed system cost and the original cost figure allowed by the Commission. It is this $1,800,000 item which the Company contends was improperly excluded from the rate base.

The argument that this $1,800,000 should have been included in the rate base is predicated upon the proposition that system cost of these electric properties exceeded the original cost of said properties by that amount. At the

outset the Commission challenged the correctness of this proposition. The electric properties were acquired as a part of a transaction involving the sale of four separate groups of properties—to wit: the electric properties, the railway system, the artificial gas and the steam heating properties. At the time of acquisition no attempt was made to segregate the amount of the total purchase price to be allotted to any particular property. It is referred to as a "basket transaction" under which a "basket" of properties was sold for a total, unsegregated purchase price. The Company freely admitted that there was no documentary evidence by which it could now be told how much of said total price should have been allocated to the electric properties. The Company's evidence, designed to show that 58.9% of the total purchase price should be allocated to the electric properties, was found by the Commission to be not convincing. It amounted to little more than a rough estimate based on a segregation of the earnings of these various properties.

Further there is some disagreement concerning the amount actually paid by the Traction Company as the total purchase price. The Company contends that a total of $16,260,905.34 was paid for all the properties. This figure was apparently arrived at by adding the cost of capital stock issued ($1,024,215.39) to the amount of funded debt assumed ($15,476,000) and subtracting therefrom net sundry assets in the amount of $239,310.05. The Commission questioned the correctness of this figure by noting that the Company had failed to consider plant accounts, the reserve for depreciation and surplus in its computation. In view of the indefinite nature of this evidence as to the amount of the total purchase price which should have been allocated to the electric properties and in view of the question regarding the total purchase price paid, we cannot say that the Commission was arbitrary in not accepting the Company's estimate and in using in lieu thereof the Company's own book figures regarding the original cost of these electric properties.

We do not understand that the Company seriously contends that this $1,800,000 was absolutely correct and that this is the exact figure which should have been adopted. Rather it complains because the Commission refused even to attempt to estimate the system cost of the electric properties. It contends that the evidence was sufficiently clear to enable the Commission to make an estimate concerning the amount that should have been allocated to the electric properties and that every inference from the evidence is that the system cost (the amount actually paid by the Traction Company) was higher than original cost (the amount it originally cost to construct).

It should be noted that in regard to all other property which was represented in the rate base by including the system cost of said property, the Company actually owned the property. But in regard to this property all the Company had was a lease—it did not acquire the property. We are not prepared to hold that the Commission was required to include in the rate base the price which the Traction Company paid for this property. The Traction Company still owns it—it is not unreasonable or arbitrary to hold that the Traction Company should absorb the cost of the intangible assets, such as good will and going concern value (if any such intangible values in fact existed) which were incident to the purchase of this property from the Oregon Short Line Railroad Company group. When this last mentioned factor is taken together with the fact that the evidence designed to show that the system cost which should be allocated to the electric properties, which cost was considerably higher than original cost, is nothing more than a rough estimate, it appears that we should not hold that the Commission was unreasonable and arbitrary in excluding this estimated figure of $1,800,000 and accepting in lieu thereof the Company's original cost figures.

## Trended Cost

The Company next urges that the Commission was arbitrary in refusing to give effect to evidence concerning

the investment which would have been necessary to acquire and construct the physical properties had the dollars which were spent in past years for the acquisition and construction of said properties been the equivalent in purchasing power of the 1941 dollar. This evidence, disclosed by the testimony and exhibits of witness Benjamin L. Smith, purported to show that the 1941 and 1942 dollar had a lower purchasing power than the dollars which were spent in past years; that if the Company has used dollars with purchasing power equal to the 1941 or 1942 dollar, considerably more dollars would have had to have been used to acquire and construct these properties. Counsel for the Company in its brief stated that

"The Company's purpose in introducing such testimony was to present evidence of value which would be helpful to the Commission in reaching a just conclusion as to the fair value of the property of the Company used and useful in rendering service to its customers in the State of Utah. * * *"

In view of this avowed purpose, it would seem that our holding that the Commission was not required to find the "present fair value" of the Company's property, and our holding that the Commission was not required to give effect to evidence regarding "value," should completely dispose of this contention. If the Commission was not required to find value nor to give effect to evidence regarding value, it could not be held to have been arbitrary had it completely disregarded this evidence which was adduced solely for the purpose of showing value.

In regard to this evidence the Commission said:

"We believe that the theory adopted by this witness [Smith] is fundamentally unsound. It should not be used as a guide to fair return or capital requirements of the Company because investments are not made on such a wholly impractical basis. The investment in utility bonds and preferred stocks is made on the basis of a fixed return and the return on utility common stock is considered in connection with the fair rate of return. It is idle to argue that the obligations of the ratepayers to the Company should be based on

the fluctuating value of the dollar when the Company has no such obligation to its investors."

We deem the various propositions asserted in this statement by the Commission to be essentially sound. They will bear some amplification.

In his concurring opinion in *Southwestern Bell Tel. Co. v. Public Service Commission,* 262 U. S. 276, 307, 43 S. Ct. 544, 553, 67 L. Ed. 981, 31 A. L. R. 807, Justice Brandeis said that:

"About 75 per cent of the capital invested in utilities is represented by bonds. He who buys bonds seeks primarily safety. If he can obtain it, he is content with a low rate of interest. Through a fluctuating rate base the bondholder can only lose. He can receive no benefit from a rule which increases the rate base as the price level rises; for his return, expressed in dollars, would be the same, whatever the income of the company."

This observation made by Justice Brandeis would also hold true as to preferred stockholders. The return which a preferred stockholder is to receive on his investment is a fixed return. He can gain nothing from having a fluctuating base which varies with the purchasing power of the dollar. The number of dollars which he would receive would not increase with an increase in company income. He like the bondholder could not gain by the adoption of a rate base that would fluctuate as the dollar changed in value.

It would be the common stockholder who could expect to reap any benefits that would inure to the Company as a result of tying the rate base to the fluctuating value of the dollar. If this factor is to be taken into account for the benefit of the common stockholders, we agree with the Commission that it can best be given effect in fixing the rate of return which is to be allowed. A fluctuating rate of return would be a much better way to control the amount which the common stockholder should receive than a fluctuating rate base. In its report the Commission stated that

the effect which changing price levels would have upon the fair return to the Company "will be adequately recognized and compensated for in the rate of return which we shall apply to the just and proper rate base." The Commission cannot be held to have been arbitrary in refusing to give effect to the evidence of cheaper dollars of 1941 and 1942.

## The Pattern Year

At the conclusion of the hearing the Commission found that the Company had been earning in excess of a fair return on a just and proper rate base. The Company had net electric operating revenues of $5,343,859 in 1941. Six per cent (the rate of return found by the Commission to be reasonable) on the rate base which the Commission found to be just and proper would have yielded only $3,838,215. From this the Commission concluded that the Company had earned $1,504,644 more than a fair return in 1941. The Commission undertook to formulate a rate reduction order which would reduce Company revenues to the proper level. It used 1941 as a pattern year or a guide to estimate the annual operating expenses and the number of kilowatt hours that the Company could reasonably be expected to sell each year in the immediate future.

The rate order directed the Company to formulate a schedule of charges for electrical energy so as to reflect reductions in price per kwh which, when applied to the 1941 volume of sales, would amount to a reduction in gross receipts of not less than $1,504,644. In making this order the Commission concluded that "There is no foreseeable condition which would warrant a conclusion that future revenues or earnings would be less than those of the year 1941." So long as operating expenses do not substantially exceed those of 1941 and the volume of sales of electrical energy remains substantially the same as in 1941, the Company will, on these new rates, be able to obtain a fair (6%) rate of return on the established rate base.

·The company contends that 1941 was an abnormal year and that it could not be used as a guide to future revenues and expenses of the Company. The argument implicit in this contention is that sales were abnormally high and/or that expenses were abnormally low in 1941. The Company also urges that the Commission should have taken Company experience over several years as the true pattern. The Company, in support of its argument that sales in future years cannot be expected to equal the volume attained in 1941, produced evidence calculated to show that Utah Copper Company would soon supply its own electrical needs. Utah Copper Company, in 1941, was the Company's largest purchaser—it purchased nearly 50% of all power sold by the Company in Utah.

In attacking the choice of the year 1941 as the pattern year the Company seems to take the position that the Commission is only trying to fix *post-war* rates. It seems to forget that the rates established will also be in effect for the duration of the war emergency. The Commission was not required to set rates at a level which would permit excessive profits during the war merely because at some indefinite date in the unforeseeable future economic conditions might return to "normalcy." The president of the Company stated, in explanation of statements made in the 1941 annual report to the stockholders of the Company, that so long as the activities which have grown up as a result of the war continue in operation, it would be an advantage to the Company to be relieved of the necessity of selling low priced power to the Utah Copper Company. His testimony indicates that so long as present conditions prevailed the Company had no serious problem in selling all of the electric energy that it could produce with its present plant.

The revenues and expenses for 10 months of 1942 and estimated revenues and expenses for last two months of 1942 and all of 1943 were introduced in evidence. The net operating revenue for 1942 and estimated revenues

for 1943 were considerably higher than for 1941 when the figures for all years are considered before federal income tax and excess profit taxes were deducted.

However, when federal income and excess profit taxes are included in the computations it appears that net operating revenues for 1942 and 1943 would be somewhat lower than those of 1941. This is occasioned by the fact that the figures when including said taxes include for 1942 nearly $1,480,000 in excess profit taxes, which taxes would not be imposed after the proposed rate order is put into effect and were not included in 1941. It would seem, therefore, that the Commission has ample support for its finding that net operating revenues for 1942 and estimated revenues for 1943 after the rate reduction would be higher than in 1941.

In answer to this, the Company notes that the comparison of one war year with another war year give no reliable guide to the expectancies of normal years of peace. With this we agree. But it should again be noted that the Commission was not establishing rates purely for the post-war era. These same rates are expected to be in effect for the duration of the war emergency. The fact that there may in the future be a business recession is no justification now for exorbitant rates. It is to be expected that if unusual economic repercussions follow this war that the Commission would make the necessary adjustments in the Company's rate schedule. These comparisons between 1942 and 1943 on the one hand and 1941 on the other do indicate that so long as the war and the increased industrial activity resulting from the war continue, the Company can be expected to equal 1941 net electric operating revenues. We are not prepared to say that the Commission was required to attempt to estimate how long it will be after the war before we return to "normalcy." The president of the Company, in testifying, stated: "When the war is over, and any speculation as to what is going to happen when the war is over reaches pretty far out into the realm of speculation—I think

when that time comes the job will be ours to get out to try and find this market." (The market for power released by Utah Copper.) It would appear that this is a correct appraisal of attempts to foresee economic conditions. Thus, unless there were evidence in the record which would affirmatively show that the established rates will not yield a fair return on the established rate base, we will not say that the Commission was arbitrary.

The Company relied primarily upon the loss of the Utah Copper Company business to show that future years would yield less revenue than was obtained in 1941. But the president of the Company in a report to the stockholders admitted that it would be an advantage to the Company to lose this account so long as the increased activity incident to the war continued. At the hearing he admitted that such a report was made to the stockholders and that the statements made in the report were true. The advantage came from the fact that power was sold to the Utah Copper Company at a rate considerably lower than it was sold to any other consumer. Because of the war activity in the area served by the Company, it was able to find other sales for its power and the sales would be at a higher rate per kwh. Since the Company could not have furnished the Copper Company with its full power needs and also furnished all the power needs of the war industries and regular consumers, it would have had to expand its productive capacity. This additional capacity may not be needed in post-war years. If the Company had been required to expand to meet the needs of the Copper Company and all other needs as increased by the war and then had lost the Copper Company business and had had its other purchases reduced by a post-war recession, it would have been faced with productive capacity far in excess of available purchasers. It is therefore understandable why the president of the Company said it was an advantage to have the Copper Company start to furnish its own power needs at this time. So long as the Company is able to replace the revenues

which would be lost by the loss of the Copper Company business, it will not be prejudiced by the Commission's rate order.[8]

### Contention That Commission Relied on Matters Not in Record

In regard to expected electric revenues in post-war years, the Commission said in its report that as it then viewed the whole pattern "of post-war electric revenues for the Company it now appears that without a rate reduction they would have equalled or exceeded the revenues collected during the year 1941." While there is some evidence in the record regarding expectant sales of electrical energy in the future and some evidence as to the growth of this area industrially, the Commission seems to have predicated this holding upon a matter which was never made a part of this record. This brings us to a further specification of error urged by the Company. The Commission throughout its report has made several references to matters which cannot be verified from any matters in the records which were certified to this court. The matters to which the Commission thus alluded went beyond the mere references to other reports and decisions. For example, in regard to the discussion of post-war electrical revenues, the Commission referred to testimony of Mr. Gadsby in another case [No. 2652] which was pending before the

---

[8]It should be noted that it would not be necessary to find new purchasers for all the power which previously had been sold to the Copper Company in order to secure the same revenues. The rate to the Copper Company was much lower than rates to various other users. It annually purchased over 453,000,000 kwh at a rate of 5.2 mills per kwh for a total of over $2,354,000. Exhibit "Y" shows that the average charge for sales, exclusive of Utah Copper Company sales, was 20.09 mills. If the power released by the Utah Copper Company could be sold at the average price, the revenues lost by the loss of the account could be replaced by a sale of about one-fourth of the total power previously sold to the Copper Company. The job of replacing this lost revenue is not therefore one of finding purchasers for this 453 million kwh, and will not develop at all until after the war boom is past and maybe not then.

Commission at about this same time. Mr. Gadsby had no opportunity at this hearing to explain this testimony to show why it would not be applicable to the various situations involved in this case or to deny the conclusions which the Commission drew from it. Such references to matters which the Company has had no opportunity to explain or rebut certainly cannot be commended.

In *Los Angeles & Salt Lake Railroad Co.* v. *Public Utilities Commission*, 81 Utah 286, 17 P. 2d 287, 290, a similar point was raised. The question before the Commission was whether a railroad could be permitted to discontinue maintaining a station agent at Faust, Utah, without impairment of the services which the law required it to furnish to the public. At this hearing no evidence was taken regarding the needs of various sheepmen who used the road for movement of livestock and feed. The Commission had had another similar case a short time before this hearing. This earlier case involved the closing of the station at St. John some 12 miles away from the Faust station. In the hearing on the St. John case considerable evidence was introduced concerning the needs of the various sheepmen. In disposing of the case involving the closing of the Faust station, the Commission relied upon evidence which had been introduced in the St. John case. On certiorari this court held that this was error. We said:

"The evidence adduced in the St. John Station Case in this regard cannot be considered as evidence adduced in this case. While the same counsel for the railroad may have appeared in both cases, and the same witnesses testified for the railroad in both cases, * * * yet the cross-examination which the railroad counsel might direct in the Faust case to the witnesses who appeared in the St. John case, if they appeared in the Faust case, might vary materially because of the new witnesses who appeared in the Faust case. The commission, like a jury, can consider such facts in relation to evidence adduced which constitute the common facts of life and which form the common knowledge of mankind and can take judicial knowledge of such fact as a court may take judicial notice of. Such facts permit the fact finder to interpret evidence and articulate it to the general facts of life. The commission may also, perhaps, take judicial notice of such facts and practices as are generally known through-

out the whole field of railroad transportation; * * * but it cannot take its special knowledge which it may have gained from experience or from other hearings and base any findings or conclusions upon such knowledge. That is fundamental."

To the same effect see *Spencer* v. *Industrial Commission,* 81 Utah 511, 20 P. 2d 618.

Gellhorn in his work on "Administrative Law" discusses these and various cases from other jurisdictions. See page 652 to 658. He suggests that in cases like these the administrative agency is in fact merely referring to its official files. He notes that while this is unconventional, it is likely to be a very trustworthy source of information and that the matters contained in the file may supplant the need for other evidence. He then concludes that:

"3. The objection that the material so incorporated in the record is incompetent because there is no opportunity for cross-examination, should be rejected; but

"4. Opportunity ought to be afforded to rebut, explain, or qualify, even where the material is derived from documents originally made available by the party against whom it is now being used."

Because of the above authorities, we must conclude that the frequent references by the Commission to matters not in the record was error. However, in no instance are any of the material findings or conclusions made by the Commission without other supporting competent evidence. For this reason, we are not inclined to reverse this case for this error. This is, however, the third time that this question has been before this court and we have condemned this conduct in unmistakable terms. This practice should not be followed in the future.

Rate of Return

In regard to the contention that the rate of return (6%) allowed by the Commission would be confiscatory, it is noted in the Company's brief that "The determination of a fair rate of return is a difficult task and in the final outcome must rest in the sound judgment of ▮▮▮ those who must make the determination. However, that judgment must be based upon competent evi-

dence." As to the type of evidence that should be considered by the Commission in determining a fair rate of return, both the Company and the Commission cite *Bluefield Water Works & Improvement Company* v. *Public Service Commission*, 262 U. S. 679, 692, 43 S. Ct. 675, 67 L. Ed. 1176. (The language to which each refers is reported on page 692 of 262 U. S., on page 679 of 43 S. Ct., 67 L. Ed. 1176.) Each refers to the portion of the opinion in which the court said:

"* * * What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

This language was also quoted with approval by the Commission in its report. Both sides apparently concede that it correctly states the law.

The Commission's report referred to Exhibit "M," introduced by the Commission's staff, to ascertain current data concerning interest rates, "utility interest rates and yields and recent financing, general economic conditions and comparative stability of utility earnings and earnings of other enterprises. Also presented in this exhibit is evidence as to local conditions in the area served by the Utah Company and as to idle investment funds and the factors contributing to such idle money." It noted that the Company was presently engaged in a refinancing program and could be expected to obtain capital at current rates. We have examined Exhibit "M" along with the other

matters referred to by the Commission and it appears that there is competent evidence from which the Commission could have concluded that a 6% rate of return would be fair and reasonable. In view of the pending refinancing program the past financial history of the company was not so important as current financial and economic conditions. There is no evidence which would require a holding that a 6% rate of return is not adequate. It therefore cannot be said that the Commission was arbitrary in fixing 6% as the fair rate of return. Further it is to be assumed that if future developments show that the Company has not been able to sell its bonds at anticipated low rates, it can apply to the Commission for any necessary relief.

### Allowance for Federal Taxes

The Commission, in determining how much should be allowed to cover anticipated federal taxes under the Revenue Act of 1942, 26 U. S. C. A. Int. Rev. Acts, noted that "There are three distinct taxes on income embodied in the 1942 act. They are the 24% normal tax, the 16% surtax and the 90% excess profits tax." The Commission held that "There is conclusive and uncontroverted evidence in the record which proves that under reasonable rates and earnings the Company will not be subject to the excess profits tax." For that given reason no allowance was made for future excess profit taxes. This was not a mere conjecture on the part of the Commission. There was evidence to support it. It should be further noted that whether future experience bears out the Commission's expectations based on evidence only the future will disclose. In these matters there are certain elements of prediction based on evidence which appears to make the prediction reasonable. If it is found by experience that the predictions do not square with the future experience resort may be had to the Commission to remedy it. In regard to the surtax the Commission said:

"In the computation of the surtax a generous concession was made, to public utilities only, by allowing a credit for dividends paid on preferred stock."

It then concluded that

"In the instant case * * * the credits and exemptions to this Company under the Revenue Act of 1942 are liberal enough to exempt it from the payment of excess profits taxes under reasonable rates and earnings.

"The credit for preferred stock dividends allowed public utility corporations also exempts the Company from the payment of the surtax. Thus we need make allowance only for the 24% normal tax."

The Company in support of its contention that the Commission was arbitrary in its allowances for federal taxes notes that "The 1942 Revenue Act imposes a normal income tax of 24%, a surtax of 16% and an excess profits [tax] of 90%. It is undisputed that the base for the calculation of both the normal taxes and surtaxes, is the same." The Company then notes:

"But the Commission orders that the Company may not include surtaxes upon income in its operating expenses. Let us illustrate the effect of this. The Company might earn and have on hand $1,000,000 available for the payment of preferred dividends. Under the Revenue Act of 1942 the 16% Federal surtax upon that amount of earnings would be forgiven to the extent that the million dollars were paid out to preferred stockholders. But if the Company should decide that it could not afford to pay the dividends but needed the money to provide work for returning soldiers, it would be required to pay the surtax amounting to $160,000. Under all the cases upon the subject the Company would be entitled to charge the amount of such taxes to its operating expenses. But the Commission, upon the erroneous and bold assumption that the Company may and will pay all dividends accruing upon its preferred stock, has ruled that no deduction on account of surtax may be made as an operating expense. This is not only unreasonable, arbitrary and capricious, but is an attempt to substitute its judgment for that of the Company's Board of Directors in determining whether earnings should be paid to stockholders or employed for Company purposes."

Clearly the Commission had no authority to determine when the Company should pay dividends to its preferred

stockholders. If in the sound business discretion of the directors of the Company it were determined that dividends should not be paid for any particular year, ■ it would be no concern of the Commission. If the directors of the Company elect in the future for sound business reasons to withhold payment of dividends on preferred stock and as a consequence a Federal tax (surtax) of 16% is imposed, it would appear that the Company should be permitted to include the surtax so paid in its operating expenses. See *Galveston Electric* v. *Galveston*, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; *Georgia Ry. & P. Co.* v. *Railroad Comm.*, 262 U. S. 625, 633, 43 S. Ct. 680, 67 L. Ed. 1144.

Under the above authorities it appears that the Company would be entitled to an allowance for all surtax payments actually made. But there is no basis for an allowance for surtax payments unless the Company in fact is required to make such payments. The Company argues for a position which would grant it an allowance sufficiently large to pay a 16% surtax without regard to whether any payments are actually made. Then if the Company were to elect to pay dividends so that the surtax would be excused, the allowance would in effect be a gratuitous award to the Company. The dividend history of the Company set out in Exhibit "R" shows that the Company paid a full dividend in 1941 and that, except in 1933, it has paid some dividends every year since 1913. In view of this history there is no justification for an assumption that no dividends will be paid in the future. The indication is that at least some of the surtax will be forgiven every year because of the payment of some dividends. The making of any allowance for taxes which may or may not be paid depending upon whether the Company pays dividends is at best highly speculative. Perhaps the allowance of any amount under such circumstances should await the actual happening of the event—the payment of the tax. But we need not decide that point now for it appears that the Commission made a sufficient allowance for taxes to cover any surtax which

the Company might be required to pay. This being so, the Company cannot claim that it has been prejudiced by the Commission's ruling that it need "only make an allowance for the 24% normal tax."

On page 7 of Exhibit "T" various figures taken from the Company's income tax work sheets are set forth. This exhibit shows a net taxable income in 1941 of $1,868,662. The rate order would cut down the gross revenues of the Company by $1,504,644. Expenses are apparently expected to remain the same. The exhibit indicates that the total reduction in gross revenues (1,504,644) is properly taken from the net taxable income to give net taxable income expected after the rate reduction goes into operation. This would leave a net taxable income of $364,018. A 24% normal tax on this amount would be $87,364. A 16% surtax on this amount would be $58,243. The total normal and surtax would thus be $145,607. The Commission allowed $174,651 for federal taxes. It therefore appears that the Company has not in any event been prejudiced in this regard.

It should be noted here that the net taxable income is not computed in the same manner nor does it contain the same elements as the return allowed to the Company by the Commission. The Commission found that the correct rate base would be $64,249,502 for Utah operations and that the Company would be entitled to earn 6% on this base. Said 6% is to be above all costs of operation, including federal income taxes. This would net the Company $3,-854,970 from which the Company could pay its proportion of fixed charges and dividends allocable to Utah. In addition the Company would have earnings from its other properties not used and useful in Utah operations, that is, its properties here and in the other states. This is noted so that it will not be inferred that the Company had only a net income of some $364,018 for purposes of meeting all fixed charges, debt retirement and dividends. This last mentioned figure is the net for tax purposes under the anticipated rate reduction and for that purpose alone.

In this regard it might also be noted that the public should not in any event be forced to pay rates based on the amount paid in by stockholders unless the amount paid is represented in properties used and useful in serving the public. It may be that the capital of the preferred stockholders was impaired by payment of some $7,200,000 in common stock dividends over the years from 1925 to 1932 inclusive. So long as the Commission has included in the prudent investment base all of the investments which should have been properly included and has allowed a reasonable rate of return thereon, the fact that the return allowed will not yield a sufficient amount to pay full dividends on the Company's stock is not grounds for complaint. Using 1941 as the pattern year the return allowed here is adequate to pay all fixed charges and to allow substantial payments on that portion of the preferred stock dividends allocable to property used to serve the Utah customers. Future anticipated reductions in fixed charges over those payable in 1941 present a picture not unfavorable to preferred stockholders.

### Allowance for Depreciation

In arriving at the amount which should be allowed as "accrued depreciation" and the annual charge for depreciation reserve, the Commission based its computation on the cost of the property. The Company contends that this was error. It urges that the Commission was required to use value as the base for figuring depreciation. In the Company brief it is stated:

"The amount required to make replacements or to save whole the investment will not be same as the cost of the retired unit shown on the books of the Company, except by accident, because of the change in price levels and the use of different dollars to state the original cost and current construction cost and may not in all cases be the amount required to make replacements."

In short, the Company takes the position that it is entitled to charge as a depreciation expense a sum large enough to replace the property which it from time to time

has to retire—enough to keep up the value of the property. The Commission allowed only enough to preserve the amount invested in the retired property.

The Company primarily relies upon the holding of the case of *United Railways & Electric Co.* v. *West*, 280 U. S. 234, 253, 50 S. Ct. 123, 126, 74 L. Ed. 390, in which the majority of the court held that:

"One of the items of expense to be ascertained and deducted is the amount necessary to restore property worn out or impaired, so as continuously to maintain it is nearly as practicable at the same level of efficiency for the public service. The amount set aside periodically for this purpose is the so-called depreciation allowance. Manifestly, this allowance cannot be limited by the original cost, because, if values have advanced, the allowance is not sufficient to maintain the level of efficiency. The utility 'is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years, the original investment remains as it was at the beginning.' [*City of*] *Knoxville* v. [*Knoxville*] *Water Co.*, 212 U. S. 1, 13, 14, 29 S. Ct. 148, 152, 53 L. Ed. 371, 380."

To this holding Justice Brandeis entered a vigorous dissent. In a learned opinion, well documented, he discussed the prevailing theories of depreciation accounting and the economic concepts involved. He advocated the use of cost as a basis for computing annual depreciation and criticized the use of value in the place of cost. This dissent is of particular importance for it has subsequently been cited with approval by the United States Supreme Court and the holding of the majority in this regard has been expressly overruled. See *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed.—. In his opinion Justice Brandeis quoted with approval from a pamphlet issued on October 15, 1921, by the Chamber of Commerce of the United States entitled "Depreciation." That quotation follows:

" 'When the cost of an asset, less any salvage value, has been recovered, the process of depreciation stops, the consumer has paid for that particular item of service. There are those who maintain that the obligation of the consumer is one rather of replacement—

building for building, machine for machine. According to this view depreciation should be based on replacement cost rather than actual cost. The replacement theory substitutes for something certain and definite, the actual cost, a cost of reproduction which is highly speculative and conjectural and requiring frequent revision. It, moreover, seeks to establish for one expense a basis for computation fundamentally different from that used for the other expenses of doing business. * * * As one writer has expressed: "The fact that the plant cannot be replaced at the same cost, but only at much more, has nothing to do with the cost of its product, but only with the cost of future products turned out by the subsequent plant." As the product goes through your factory it should be burdened with expired, not anticipated, costs. *Charge depreciation upon actual cost less any salvage.*' "

As already noted the Supreme Court cited Mr. Justice Brandeis' dissent with approval in the Hope Case. At page 606 of 320 U. S., at page 289 of 64 S. Ct., the court stated (omitting footnotes) :

"* * * this Court recognized in *Lindheimer* v. *Illinois Bell Tel. Co.,* supra, the propriety of basing annual depreciation on cost. By such a procedure the utility is made whole and the integrity of its investment maintained. [Citing the opinion of Mr. Justice Brandeis in footnote.] No more is required. We cannot approve the contrary holding of *United Railways* v. *West,* 280 U. S. 234, 253, 254, 50 S. Ct. 123, 126, 127, 74 L. Ed. 390.".

The authorities upon which the Company relied in support of its position on depreciation allowance have been overruled by this decision in the Hope case. The position by the Company cannot be sustained.

The above discussion covers every major assignment of error urged by the Company in support of its petition to have the order of the Commission set aside. We find no prejudicial error in the proceedings before the Commission nor in its holdings. It follows that the order of the Commission must be and it is hereby affirmed.

LARSON, McDONOUGH, and WADE, JJ., concur.

HOYT, District Judge, sat in place of MOFFAT, J., deceased.

HOYT, District Judge.

I concur in the opinion of the CHIEF JUSTICE. I do not, however, agree with implications which might be drawn from language quoted in the opinion from the case of *Federal Power Commission* v. *Hope Natural Gas Company,* and because I deem the matter vital I shall call attention to it. The language referred to is as follows:

"When the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. \* \* \* Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. \* \* \* It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."

From that language contained in a decision of the highest court in the land, other courts and public service commissioners may argue that a rate order should be upheld unless it can be shown to be confiscatory, regardless of whether the Commission based it upon relevant facts or upon a throw of dice or instinct or intuition. That is obviously not the law. Rate limitation is a legislative function, it is true, but courts should set aside a rate order unless constitutional procedure has been followed. Due process requires not only notice and opportunity to be heard, but requires that, in making a rate order, the Commission must give consideration to operating costs, maintenance, taxes, capital charges, reserves for depreciation, etc. and must also consider a *proper basis upon which to fix the rate or amount of return to the owners.* The Hope case does away with the rule that the owners of a utility are entitled to a reasonable return based upon reproduction cost or so-called present fair value of the properties constituting the utility system. But I think, regardless of the language above quoted, it should not be construed as holding that there is no fundamental basis required to be considered in determining the amount or rate to be allowed the owners. It is shown from

the record in the case that the Commission had given consideration to evidence of operating costs, maintenance, taxes, capital charges, reserves for depreciation, the financial history of the company, the general economic conditions, the rates of earnings on investments with similar risks, and the amount invested in the property by the owners; also that the Commission had decided that *the proper rate base* upon which to fix the amount of profit or percentage of return to the owner was the amount actually and prudently invested in the property, after deduction for accrued depletion and depreciation. The commission then decided that a reasonable return, based upon such rate base, was $6\frac{1}{2}$ per cent per annum. Obviously the rate of return decided upon in the case was not the result of intuition or dice-casting but was fixed upon the logical foundation of the "prudent investment" base advocated by Mr. Justice Brandeis in *Southwestern Bell Telephone Company* v. *Public Service Commission,* 262 U. S. 276, 292, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807.

There must be some yardstick to be used by the commissions and the courts in determining whether a rate of return or dollar amount of return is or is not confiscatory. The abrogation of the rule of *Smyth* v. *Ames* must not be taken to mean that there is no need to establish a rate base. There must be a rate base upon which the rate of profit is to be calculated. Both public service commissions and the courts must concern themselves with the property affected by a rate-fixing proceeding. Upon the property devoted to the public use the owner is entitled, under the Constitution, to the opportunity to earn a fair return, except that rates may, in no event, be prohibitive, exorbitant, or unduly burdensome to the public. But the property or thing devoted by the investor to the public use is not specific items of property but capital embarked in the utility enterprise. That is the Brandeis doctrine, as I understand it. In the Hope case the Commission followed that doctrine and the Supreme Court affirmed it. That should be remembered in connection with the language from the opinion above quoted.